SAMUEL GAITER,

        Plaintiff,

- versus -

LIBERTY MECHANICAL CONTRACTORS,

        Defendant.

MEMORANDUM AND ORDER

13-CV-7116 (JG)(VMS)

A P P E A R A N C E S:

 SUSSMAN & WATKINS
  P.O. Box 1005
  1 Railroad Avenue, Suite 3
  Goshen, NY 10924
 By: Michael H. Sussman, Esq.
  *Attorneys for Plaintiff*

 RUSKIN MOSCOU FALTISCHEK, P.C.
  1425 RXR Plaza, East Tower
  15th Floor
  Uniondale, NY 11556
 By: Joseph R. Harbeson, Esq.
  Kimberly B. Malerba, Esq.
  Natasha A. Moskvina, Esq.
  *Attorneys for Defendant*

JOHN GLEESON, United States District Judge:

  Plaintiff Samuel Gaiter, an African-American plumber, initiated this lawsuit against his employer, Liberty Mechanical Contractors, LLC ("Liberty"), alleging that Liberty unlawfully fired him on account of his race. Gaiter alleges violations of 42 U.S.C. § 1981 and New York Executive Law § 296. Liberty now moves for summary judgment on both claims.

  For the reasons explained below, Liberty's motion is denied.

BACKGROUND

Unless otherwise noted, the following facts are undisputed in the parties' statements submitted pursuant to Local Rule 56.1 and their supporting materials.

Liberty is a plumbing contractor. In 2012, it was engaged as a subcontractor on a project located at 388 Bridge Street in Brooklyn to install plumbing in a 49-story building (the "Bridge Street Project"). Liberty employed a regular staff of plumbers from Local 1 of the National Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industries (the "Union").[1] In addition to unionized plumbers (also referred to as "journeymen"), Liberty hired helpers and apprentices who assisted with the work. Liberty's management included Vice President Richard Radliff, Foremen Joseph Giordano,[2] and Deputy Foreman Daniel Sabarese. Sarbarese is Caucasian.[3]

Gaiter is a member of the Union. As many union plumbers do, he "shaped up" the Bridge Street Project by walking onto the jobsite and inquiring about employment opportunities. After discussions with a Liberty representative named "Michael,"[4] Gaiter was hired as a journeyman in November 2012. Radliff, the Vice President of Liberty, testified that Gaiter was the only plumber hired as a walk-on to the Bridge Street Project. Reply Aff. of Richard Radliff ¶ 6, ECF No. 24 at 2. Of the approximately 30 plumbers working on the project

---

[1] In its papers, Liberty refers to the Union as "Local Union No. 1 of the United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry of the United States and Canada." Def. Br. at 3, ECF No. 19 at 7. For the purposes of this opinion, the Court is adopting the name as stated in the Liberty's Rule 56.1 Stmt. *See* Def. Rule 56.1 Stmt ¶ 8, ECF No. 20 at 2.

[2] Giordano began working on the Bridge Street Project in October 2012 as an assistant and became the foreman a few weeks later. Giordano Dep. at 20, ECF No. 18-5. Since the deposition transcripts are paginated in multiple ways, for clarity's sake, all citations will be to page numbers generated by the court's electronic filing system, *i.e.*, the ECF page numbers.

[3] The Complaint identifies Daniel Sabarese as "Daniel Salzabella." *See* Compl. ¶ 7.

[4] This was most likely Michael DeMartino, the original foreman who left before the Bridge Street Project was completed. According to Sabarese, when DeMartino left, Giordano became the foreman and Sabarese became the deputy foreman. *See* Sabarese Dep. at 9, ECF No. 18-6. Sabarese was a journeyman when Gaiter was hired. *Id.* at 13.

in July 2013, at least two were African-American in addition to Gaiter.[5]  Gaiter's responsibilities on the jobsite consisted of cast iron work, and there is generally more cast iron work in the early stages of a construction project than in the later stages.  Giordano testified that he and Sabarese assigned partners based on "guys . . . that are compatible."  Giordano Dep. at 22, ECF No. 18-5.  Gaiter was paired with another African-American non-plumber employee.  Sabarese Dep. at 17.

Gaiter alleges, and Liberty disputes, that in March 2013, Sabarese subjected Gaiter to racial epithets, referring to him as "Sambo" on four separate occasions.  Gaiter states he did not report these incidents for fear of being immediately fired, and that Liberty did not provide a policy for employees to redress racial discrimination in the workplace.  *See* Gaiter Aff. ¶ 8.

Liberty terminated Gaiter's employment on or about July 16, 2013.  In a one-on-one conversation, Sabarese informed Gaiter that he was being laid off because they were "lightening up the crew."  Sabarese Dep. at 19.  Giordano was on vacation at the time, and according to Gaiter, Sabarese took advantage of the foreman's absence to terminate Gaiter's employment.

Liberty did not hire or fire employees based on seniority, but rather on their ability as determined by the foreman.  If an employee's performance was deficient, a supervisor would fill out a form notifying management so that Liberty could avoid hiring that particular employee on future projects.  *See* Radliff Dep. at 29-32.  No such form was filled out for Gaiter, and Liberty concedes that there was no problem with Gaiter's work on the Bridge Street Project.  Def. Br. at 7 ("It is undisputed that Gaiter . . . performed his job in a satisfactory manner.").

---

[5]  Gaiter contends that there were two other African-American plumbers and several helpers who were of African or African-American descent, whereas Liberty asserts that "up to five" plumbers were African-American.  Def. Rule 56.1 Stmt ¶ 17; Pl. Reply to Def. Rule 56.1 Stmt ¶ 17.

Liberty maintains that it was Radliff who made the decision to let Gaiter go in consultation with the then-foreman Giordano. Moreover, Liberty contends, the decision was strictly a function of its business needs and the cyclical nature of construction work. Specifically, it continues, fewer plumbers were needed for cast iron work as the Bridge Street Project progressed. Since there was no alternative placement for Gaiter, it made sense to fire the only plumber who walked on to the project as opposed to the "core" plumbers.

Liberty maintains that it did not hire anyone to replace Gaiter, and continued to employ other African-American plumbers after July 2013. Gaiter claims that, aside from one other African-American employee, no one else was fired with him. Both sides rely on Liberty's records submitted to the Plumbers and Pipefitters National Pension Fund for August and September 2013 to support their respective claims. *See* Affidavit of Richard Radliff ("Radliff Aff."), Ex. B, ECF No. 18-3.

## DISCUSSION

A. *Legal Standards*

1. *Summary Judgment*

A court will grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought." *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (quotations omitted).

The court must review the record as a whole and, in doing so, "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted). As such, "the court should give credence to the evidence favoring the nonmovant as well as the evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Id.* (quotation omitted).

A district court must exercise caution in granting summary judgment in employment discrimination cases, which typically turn on the employer's subjective intent. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *see also Patrick v. LeFevre*, 745 F.2d 153, 159 (2d Cir. 1984) ("where subjective issues regarding a litigant's state of mind, motive, sincerity or conscience are squarely implicated, summary judgment would appear to be inappropriate and a trial indispensable."). This is because "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (internal quotations omitted). However, even in the discrimination context, a plaintiff cannot elude summary judgment with mere conclusory allegations as to the employer's motive. *See Holcomb*, 521 F.3d at 137 (citing *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)); *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 150 (2d Cir. 2007) ("[I]ntent is always a subjective matter of inference and thus rarely amenable to summary judgment. At the same time, however, the summary judgment rule would be rendered sterile if

the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.") (quotations and citations omitted).

    2. *Discrimination Claims Under Title VII*

To survive a summary judgment motion on discrimination claims pursuant to Section 1981, the plaintiff must establish a prima facie case of discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Paulino v. New York Printing Pressman's Union, Local Two*, 301 F. App'x 34, 37 (2d Cir. 2008); *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). Discrimination claims brought pursuant to New York Executive Law § 296 are also reviewed under this same standard. *See Cotterell v. Gilmore*, No. 12-CV-3808 (ADS)(GRB), 2014 WL 6886079, at *13 (E.D.N.Y. Dec. 8, 2014); *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 316-17 (2004).

This framework requires a plaintiff to show: (1) that he belongs to a protected class; (2) that his job performance was satisfactory; (3) that he suffered an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination. *Demoret v. Zegarelli*, 451 F.3d 140, 151 (2d Cir. 2006) (citing *McDonnell Douglas*, 411 U.S. at 802). Once the plaintiff has made a prima facie case, the burden shifts to the defendant employer to provide a legitimate, non-discriminatory reason for the action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802-04). If the defendant makes such a showing, the burden shifts back to the plaintiff to prove discrimination, for example, by showing that the employer's proffered reason is pretextual. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804).

With respect to an employer's discriminatory statements, "the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115

(2d Cir. 2007) (citation omitted), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). "The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." *Id.* To aid in the analysis, the Second Circuit has set forth four non-dispositive factors for consideration: "(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process)." *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149-50 (2d Cir. 2010) (citations omitted).

    B.    *Application*

It is undisputed that Gaiter has successfully shown the first three elements of a prima facie case: as an African-American he is a member of a protected class; he was qualified to do plumbing work; and he suffered an adverse employment action when he was fired. However, Liberty contends that Gaiter has failed to show that his termination occurred in circumstances that give rise to an inference of discrimination. Def. Br. at 7-8. According to Liberty, there is no nexus between the racial slurs that Sabarese allegedly uttered in March 2013 and Gaiter's termination in July 2013. Liberty further argues that Sabarese's comment to Gaiter about "lightening up" the crew was indisputably in reference to the need to decrease the number of plumbers on the Bridge Street Project. In support of this interpretation, it notes that Gaiter did not directly mention Saberese's "lightening up" comments at his deposition when Gaiter was asked about what was said when he was fired.

7

Although Sabarese's "lightening up" remark is admittedly ambiguous, a reasonable jury could view it as racially charged and discriminatory. In *Abrams v. Department of Public Safety*, the Second Circuit found comments that an African-American detective would not "fit in" to a certain specialized unit supported a reasonable inference of discrimination. It concluded:

> [T]he phrasing "better fit" or "fitting in" *just might* have been about race; and when construing the facts in a light most favorable to the non-moving party, those phrases, even when isolated, could be enough to create a reasonable question of fact for a jury. It is enough of an ambiguity to create a reasonable question of fact.

764 F.3d 244, 253 (2d Cir. 2014) (emphasis in original); *see also Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (expressing similar concerns with "fit in" phrasing). Like "fit in," Sabarese's comment regarding "lightening up the crew" admits of both discriminatory and non-discriminatory interpretations. *See Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225-26 (2d Cir. 2014) (finding manager's comment that regional office "could lighten up a bit" was evidence that could support a finding that employer's non-discriminatory rationale was pretextual).

Moreover, the context surrounding the phrasing does not resolve the ambiguity. Liberty points out that Gaiter did not mention the "lightening up" comment in either his interrogatory responses or his deposition testimony. *See* Radliff Aff., Exs. C & F. Some alleged facts surrounding the remark – such as the building's progress, the diminished need for plumbers to complete the project, and Gaiter's status as a walk-on – support Liberty's interpretation that Sabarese was speaking only about the need to reduce the number of plumbers on the worksite. Other alleged facts militate against that interpretation – *i.e.*, Sabarese's calling Gaiter "Sambo" on multiple occasions, the assignment of Gaiter to work with other African-American workers,

Gaiter's satisfactory job performance coupled with Liberty's policy of retaining workers based on ability, not seniority, and Liberty's lack of a procedure to report discriminatory treatment.

Notwithstanding Liberty's assertions to the contrary, a reasonable jury could determine that Sabarese was the decision-maker who selected Gaiter for termination. *See* Sabarese Dep. at 26. ("Q. And did you make a recommendation that Neals be terminated and Gaiter be terminated? A. It was a joint discussion between me and Joe [Giordano]. Q. So the answer is you concurred with it? A. Yes."). Even if one credits Radliff and Giordano's testimony that Sabarese did not make the decision to fire Gaiter – a credibility determination I am not permitted to make at the summary judgment stage – a reasonable jury could nevertheless find that Radliff and Giordano only rubberstamped Sabarese's recommendations. The Second Circuit has noted that "impermissible bias of a single individual at any stage of the promoting process may taint the ultimate employment decision even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the process." *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 125-26 (2d Cir. 2004) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450 (2d Cir. 1999) (internal alterations omitted)).

Liberty argues that even if Gaiter has established a prima facie case of discrimination, it has raised a legitimate, non-discriminatory reason for Gaiter's firing, *i.e.*, the reduced staffing needs of the Bridge Street Project in July 2013 and the policy of firing temporary, walk-on plumbers like Gaiter before "core" plumbers. *See, e.g.*, *Florence v. U.S. Vanadium Corp.*, No. 94-CV-0693E(F), 1997 WL 128351, at *3 (W.D.N.Y. Mar. 10, 1997) (recognizing downsizing as a legitimate reason for laying off employees). To support its claim that no one was hired to replace Gaiter, Liberty submits affidavits and deposition testimony

9

showing that staffing on the Bridge Street Project decreased a month after Gaiter's layoff.[6] Moreover, several African-American plumbers remained on the crew after Gaiter was let go.

Since Liberty has provided a non-discriminatory reason for Gaiter's firing, the burden of production now shifts back to Gaiter to show that this explanation is a mere pretext for Liberty's discriminatory termination of his employment. Though it is a close call, I conclude that genuine issues of material fact remain as to whether the claimed staffing needs were a pretext.

First, whether there was more work that Gaiter could have done at the time he was fired is disputed. Gaiter claims that 24 floors had been completed when he was fired. *See* Gaiter Aff. ¶ 5, ECF No. 22. According to Liberty, Gaiter was hired to do cast iron work, and Saberese testified that cast iron work was needed on the first 40 floors of the building. Liberty, on the other hand, asserts that 40 floors were finished at the time Gaiter was laid off. As stated earlier, Liberty concedes that there was no deficiency in Gaiter's work. Also, it is unclear whether Gaiter was unable to do non-cast iron plumbing work.

Second, the extent to which Liberty sought to determine if Gaiter could be reassigned to alternative projects is contested. Giordano testified that the Tuesday before Gaiter was terminated, he tried to have Gaiter transferred to another assignment, but Radliff informed him that there was no other work available. *See* Giordano Dep. at 49-50.[7] It also appears that another journeyman plumber was successfully transferred the following month. *Id.* at 49 ("Q. . .

---

[6] Liberty submitted evidence that before Gaiter was hired, Liberty had 16 to 18 plumbers on the Bridge Street Project. Radliff Aff. ¶ 16 n.3. Then the crew increased to 28 to 30 plumbers. *Id.* By approximately a month after Gaiter's layoff, the crew had been reduced to 21. *Id.* ¶ 25 n.4; Ex. B, at D00023-24 (listing employees in August 2013).

[7] In pertinent part, Giordano's deposition testimony reads as follows: "Q. When you terminated from this job Mr. Gaìter, did you have him transferred anywhere? A. I tried to, but there was no spots available. Q. You tried to meaning what? A. In other words, I called the office and asked them. I said I need to move a couple of guys, and they said we'll get back to you. They called me and said we really don't have nothing right now, and that was it. Q. Who did you speak to? A. Richy Radliff. Q. This would have been in July at some point? A. That would have been that Tuesday prior to the layoff." Giordano Dep. at 49-50.

. Is it accurate that in late August [2013], a fellow name Cotto was discharged? A. He was requested by the local to go to another job by the union itself, but he was transferred. A. You transferred him? A. Right."). Third, despite the need to reduce the crew, the only other person fired with Gaiter was another African-American non-plumber employee. No other plumber was fired on the same day in spite of the downsizing concerns. In sum, against the backdrop of the alleged discriminator remarks described above, the foregoing disputes of fact counsel in favor of submitting Gaiter's claim of discrimination to a jury. I cannot properly conclude as a matter of law that Gaiter's race was not a motivating factor in Liberty's decision to terminate his employment.

## CONCLUSION

Liberty's motion for summary judgment is denied. A final pre-trial conference will be held on July 31, 2015 at 11:00 a.m. Jury selection and trial will begin on August 10, 2015 at 9:30 a.m.

So ordered.

John Gleeson, U.S.D.J.

Dated: May 7, 2015
      Brooklyn, New York